UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  9:18-CV-80576-ROSENBERG/REINHART

HARVEY GARBER, M.D.,

      Plaintiff,

v.

CITY OF BOYNTON BEACH, *et al.*,

      Defendants.

_____/

### ORDER GRANTING DEFENDANT CITY OF BOYNTON BEACH'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT OFFICERS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant City of Boynton Beach's Motion for Summary Judgment [DE 78] and the Motion for Summary Judgment of Defendant Officers Janelle Jumelles, John Dunlop, Even Esteves, and Peter Zampini [DE 80].  The Court has carefully reviewed the Motions, Plaintiff Dr. Harvey Garber's Responses thereto [DE 86 and 88], Defendants' Replies [DE 93 and 96], the arguments of the parties during the hearing held on June 4, 2019, and the entire record, and is otherwise fully advised in the premises.

For the reasons set forth below, the City's Motion for Summary Judgment [DE 78] is granted.  The Motion for Summary Judgment of Officers Jumelles, Dunlop, Esteves, and Zampini [DE 80] is denied.

## I.      FACTUAL BACKGROUND

On June 5, 2017, Officers Jumelles and Esteves responded to a critical-life-support call for a residence in Boynton Beach.  DE 81 at 1; DE 87 at 1.  They entered the residence, were directed to an upstairs bathroom, and discovered a deceased female in the bathtub and drug paraphernalia

nearby.  DE 81 at 1-2; DE 87 at 1.  The bathroom became an active crime scene.  DE 81 at 2; DE 87 at 1.

Dr. Garber, the decedent's father, arrived at the residence, was met by Officer Dunlop, entered the residence, and went upstairs.  DE 81 at 2-3; DE 87 at 1-2.  Officer Dunlop told him not to step into the bathroom.  DE 81 at 3; DE 87 at 2.  Dr. Garber nevertheless stepped into the bathroom, and Officers Jumelles, Esteves, and Dunlop physically pulled him out of the bathroom while Dr. Garber stated "take your hands off me" and acknowledged that he knew that it was a crime scene.  DE 81-3 at 19:48-20:07.  Officer Dunlop explained to Dr. Garber that he would be allowed into the bathroom after the scene was processed.  *Id.* at 20:08-:23.  Officer Dunlop permitted Dr. Garber to look into the bathroom without stepping inside after Dr. Garber stated he would not go into the bathroom.  *Id.* at 20:32-21:05.  Dr. Garber then sat on the floor immediately outside of the bathroom for several minutes, at times covering his face with his hands or making telephone calls.  *Id.* at 21:05-26:49.

When crime scene investigators arrived at the residence, Officer Jumelles asked Dr. Garber to move to a couch in another area.  *Id.* at 26:33-:52.  Dr. Garber stood up from the floor but insisted on standing in the hallway outside of the bathroom, stating "I'd rather have this space than you have this space."  *Id.* at 26:48-27:08.  Dr. Garber stood in the hallway for several minutes, during which time he occasionally looked into the bathroom and officers obtained information from him. *Id.* at 27:08-31:23.  Officer Zampini arrived on the scene.  *Id.* at 27:28.

Dr. Garber eventually moved toward another room and answered a telephone call.  *Id.* at 31:23-:27.  Officer Dunlop asked him not to go into the room because it needed to be processed. *Id.* at 31:24-:28.  Officer Zampini asked Dr. Garber to move further down the hallway.  *Id.* at

31:28-:30.  Dr. Garber began to move down the hallway, and Officer Jumelles placed her hand on Dr. Garber's back.  *Id.* at 31:30-:33; DE 89-2 at 29:18-:22.  Officer Jumelles would later testify that she placed her hand "softly on his back, no pressure," DE 81-1 at 64, while Dr. Garber would testify that she "gave [him] a shove" and that it "seemed like she pushed me," DE 81-12 at 97. Dr. Garber stated "don't push me" and turned toward Officer Jumelles.  DE 81-3 at 31:34-:35; DE 89-2 at 29:22-:24.  Officer Jumelles testified that Dr. Garber "took an aggressive stance." DE 81-1 at 64.  Officer Jumelles took her hand off of Dr. Garber's back, took a step backward, and said "okay."  DE 81-3 at 31:35-36; DE 89-2 at 29:24-26.

Officer Zampini directed Dr. Garber to "go," and Dr. Garber turned toward him and responded "shut up."  DE 81-3 at 31:35-:38; DE 89-2 at 29:24-26.  Officer Zampini would later testify that Dr. Garber was "right in front of" him, that he "could see that [Dr. Garber] was tensing," and that Dr. Garber was "acting irrational," was "dug in," and "wasn't moving."  DE 81-9 at 30.

Officer Zampini placed a hand on Dr. Garber's upper arm.  DE 89-2 at 29:26-:27.  At that point, a struggle between Dr. Garber and several of the officers began as they moved down the hallway, during which Dr. Garber cried "you assaulted me" and "I'll be pressing charges against you" and Officer Zampini instructed him to "have a seat on the couch."  DE 81-3 at 31:38-:59; DE 89-2 at 29:27-:48.  According to Dr. Garber and a resident of the home who was present at the time, Dr. Garber did not resist being moved down the hallway.  DE 81-12 at 133; DE 87-1 at 22-23. Officer Esteves testified that Dr. Garber was resisting and was pushing away from officers, DE 81-4 at 52, and answered in response to interrogatories that he believed that Dr. Garber "posed a threat to officer safety at the time as he completely disregarded our scene integrity and showed no regard for authority."  DE 81-11 at 6.  Officer Zampini testified that Dr. Garber was resisting

and was being aggressive and noncompliant, DE 81-9 at 34, and answered in response to interrogatories that he "felt an imminent threat by [Dr. Garber's] aggressive demeanor and active physical resistance coupled with his non-compliance of verbal commands."  DE 81-10 at 6.

Officer Jumelles instructed Dr. Garber to "sit down," and he did not immediately comply. DE 89-2 at 29:46.  However, other officers were holding onto Dr. Garber at the time, and it is disputed whether he was being held up, such that he was unable to comply.  *See* DE 87 at 6.

Dr. Garber eventually became seated on the floor and was then made to lie on the floor on his stomach while he cried "get off me," "he assaulted me," and "you broke my . . . glasses." DE 81-3 at 31:58-32:30; DE 89-2 at 29:48-30:18.  According to Officer Esteves, Dr. Garber became seated on the floor after he (Officer Esteves) "completed [a] leg sweep takedown" by hooking his leg around Dr. Garber's legs to "take the legs out from under him and bring him to the floor."  DE 81-4 at 53.  Dr. Garber acknowledged that Officer Esteves did a leg sweep to get him onto the floor and testified that he "landed very hard on the ground" and that a person or multiple people landed on top of him.  DE 81-12 at 99-100, 103.  Dr. Garber briefly grabbed onto a bedframe while being made to lie on the floor.  DE 81-3 at 32:05-08.

Dr. Garber testified that a person or multiple people were "kicking" him on his left leg in "[t]he knee area," but that he did not see the kicking because he "was face down" lying on his stomach.  DE 81-12 at 103-06.  When asked who was kicking him, Dr. Garber testified: "I can't say.  There were at least four people involved.  There could have been five or six.  I, I was in shock. I had no idea."  *Id.* at 105.  A resident of the home who witnessed the incident testified that officers repeatedly kicked Dr. Garber "everywhere," including in the leg, while he was standing to try to get him onto the floor and that officers also kicked Dr. Garber while he was on the floor.  DE 87-1

at 23-27, 49-50, 57, 61-62.  When asked which officers kicked Dr. Garber, the resident witness stated "[i]t was a few officers" and gave the descriptions of a "female," a "Spanish or darker male" who may have been "Dominican or black," and a "[p]lainclothed" officer, but also stated that all of the officers that were present participated in the kicking.  *Id.* at 26, 49-50.  A second resident witness testified that officers kicked Dr. Garber while he was on the floor.  DE 87-2 at 25-27.

Officers Jumelles, Esteves, and Zampini began to place Dr. Garber's hands in handcuffs behind his back.  DE 81-3 at 32:25; DE 89-2 at 30:13.  The resident witnesses saw Dr. Garber being handcuffed and did not see him resisting.  DE 87-1 at 27, 51; DE 87-2 at 18-19.  While the officers were attempting to place Dr. Garber in handcuffs, he stated "I'm a surgeon, don't break my . . . wrist," "I have a rotator cuff injury," and "if you pull my wrist back, you're going to break my elbow."  DE 81-3 at 32:56-33:35; DE 89-2 at 30:46-31:24.  The three officers eventually were able to handcuff Dr. Garber with his hands behind his back using two sets of handcuffs.  DE 81-3 at 33:19-34:03; DE 89-2 at 31:04-31:50.  The two sets of handcuffs permitted Dr. Garber "to have a wider spread behind his back" so that there would not be "as much stress on his shoulders."  DE 81-5 at 38-39.  While still lying on the floor, Dr. Garber stated "you hurt my wrist," "you broke my wrist for nothing," and "call the medics."  DE 81-3 at 34:08-:17; DE 89-2 at 31:57-32:05.

Thereafter, Dr. Garber turned back to the officers and stated "you three guys, was it necessary for you to take me down, I didn't do anything."  DE 81-3 at 34:26-:29; DE 89-2 at 32:14-19.  Officer Esteves stated "you put your hands on an officer," to which Dr. Garber responded "I didn't touch him."  DE 81-3 at 34:30-:38; DE 89-2 at 32:20-27.  Dr. Garber asked to have the handcuffs removed or loosened, and Officer Jumelles denied the request, stating that he had "plenty of space" in the handcuffs.  DE 81-3 at 34:40-:52; DE 89-2 at 32:28-:42.

Officers Jumelles and Dunlop raised Dr. Garber to a seated, and then to a standing, position. DE 81-3 at 34:53-35:12; DE 89-2 at 32:38-:58. Officer Jumelles and an unnamed officer escorted him through the upstairs hallway, down the stairs, and out of the residence to a police car. DE 81-3 at 35:39-36:37; DE 89-2 at 33:28-34:24. While being escorted, he stated "you're hurting me, you don't need to do this" and "what's wrong with you." DE 81-3 at 35:57-36:02; DE 89-2 at 33:46-:52. Officer Jumelles and the unnamed officer searched Dr. Garber's pockets. DE 81-3 at 36:45-37:22; DE 89-2 at 34:34-35:12. He was told to "have a seat" in the police car, and he got into the car and was driven from the scene. DE 81-3 at 37:23-39:02; DE 89-2 at 35:13-36:54.

Dr. Garber was seen at a hospital, underwent x-rays, and was "medically cleared." DE 81-12 at 116-17; DE 81-13. He was given a notice to appear for resisting an officer without violence, but that charge was later dismissed. DE 81-1 at 85; DE 81-12 at 128-29; DE 81-14.

Dr. Garber contends that, as a result of this incident, he suffered (1) a fracture to his left knee for which he used a brace, crutches, and a cane for a time and which continues to cause pain and discomfort; (2) back and spine injuries that include disc herniations and that cause pain, spasms, and discomfort; (3) injuries to both hands and wrists including nerve injuries, causing pain, numbness, swelling, weakness, and decreased range of motion; (4) reinjury of his right rotator cuff, causing pain and decreased range of motion; (4) bruising to various parts of his body; and (5) accelerated hypertension, depression, anxiety, insomnia, nightmares, and post-traumatic stress disorder. DE 81-12 at 32-34, 40-42, 51, 53-54, 56-58, 58-59, 134, 136, 139; DE 81-15 at 5-7.

## II.    PROCEDURAL BACKGROUND

Dr. Garber filed this action in state court, and Defendants jointly removed the action to this Court.  DE 1.  The Amended Complaint raises two counts under 42 U.S.C. § 1983.  DE 34.  Dr. Garber brings a claim against Officers Jumelles, Dunlop, Esteves, and Zampini for use of excessive force.  *Id.* at 6-8.  Dr. Garber also brings a claim against the City for deliberate indifferent policies, practices, customs, training, and supervision.  *Id.* at 8-12.  The Defendants now seek summary judgment on those claims.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact court return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008).  When deciding a summary judgment motion, a court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016).  The court does not weigh conflicting evidence or make credibility determinations.  *Id.*  Upon discovery of a genuine dispute of material fact, the court must deny summary judgment and proceed to trial. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).

If the movant shows that there is no genuine dispute as to a material fact, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial.  *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018).  The non-moving party

does not satisfy this burden "if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact." *Jones*, 683 F.3d at 1292 (quotation marks omitted).  The non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quotation marks omitted); *see also Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (stating that "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor" (quotation marks omitted)).

The evidence presented in this case includes videos from two body cameras.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  When a video of the pertinent events exists, the court must view the facts in the light depicted by the video.  *Id.* at 380-81.  But where the video "does not clearly depict an event or action, and there is evidence going both ways on it," the court must accept the non-moving party's version of what occurred.  *Shaw*, 884 F.3d at 1097 n.1.

## IV.     ANALYSIS

### A.     The City's Motion for Summary Judgment

Dr. Garber brings a claim against the City under 42 U.S.C. § 1983, alleging that the City has "developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the Constitutional rights of [Dr. Garber] and

of the public." DE 34 at 8-12.  Dr. Garber contends that this caused the violation of his right under the Fourth Amendment to be free from an unreasonable seizure through excessive force.  *Id.*

The City seeks summary judgment on Dr. Garber's *Monell* claim.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (holding that a municipality is not liable under § 1983 for an injury inflicted solely by an employee or agent but may be liable when the execution of the municipality's custom or policy inflicted the injury).  DE 78.  The City argues there is no record evidence to show that it has an official policy or a custom or practice of deliberate indifference to unlawful uses of force and that there is no evidence to show that it failed to adequately train or supervise any of the officers involved in Dr. Garber's arrest.  The City cites to the report by its expert in training standards, policy standards, use of force, and police practices, John G. Peters, Jr., Ph.D.  *See* DE 79-5.  Dr. Peters opines that the City's written policies were consistent with generally accepted national standards and recommended guidelines, that Dr. Graber has not provided evidence to support his deliberate-indifference claim, that statistical data shows that City police officers use force infrequently, and that the officers involved in the incident with Dr. Garber were acceptably trained and supervised.  *Id.* at 5-21.  The City contends, and Dr. Garber acknowledges, that Dr. Garber's criminology expert did not review the City's policies or procedures, did not testify as to any custom, and did not review any incidents other than Dr. Garber's arrest.  DE 79 at 3-4; DE 89 at 2-3.

Dr. Garber responds by first conceding that there is no evidence to support his claims related to policies and procedures and to failure to train and supervise.  DE 88 at 1-2. He contends, however, that a custom or practice of deliberate indifference to the use of excessive force can be inferred from the circumstances of the assault on him and the fact that there was no post-incident

investigation, citing *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985). Dr. Garber also points to data in Dr. Peters's report showing that the City had 456 use-of-force reports between 2014 and 2017, as well as to 5 incidents of use of force between 2013 and 2017 that were identified in the Amended Complaint. *See* DE 34 at 10-11; DE 79-5 at 12.

A municipality cannot be held liable under § 1983 based on a theory of *respondeat superior* or vicarious liability. *City of Canton v. Harris*, 489 U.S. 387, 385 (1989). To impose liability on a municipality under § 1983 for injuries that employees caused, a plaintiff must show that his constitutional right was violated, that the municipality had a custom or policy that constituted deliberate indifference to the constitutional right, and that the custom or policy caused the constitutional violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *Monell*, 436 U.S. 658). The requirement of a custom or policy ensures that the municipality "is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id.* at 1290 (quotation marks omitted).

A custom is a practice that is so settled and permanent that it takes on the force of law. *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). A policy is a decision that is officially adopted by the municipality or created by an official of such rank that he could be said to be acting on behalf of the municipality. *Id.* It generally is necessary to show a persistent and widespread practice to demonstrate a custom or policy. *McDowell*, 392 F.3d at 1290; *see also Craig v. Floyd Cty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (stating that a "pattern of similar constitutional violations is ordinarily necessary" (quotation marks omitted)). Random acts and isolated incidents normally are insufficient to establish a custom or policy. *Denno v. Sch. Bd. of*

*Volusia Cty.*, 218 F.3d 1267, 1277 (11th Cir. 2000). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability against a municipality." *Craig*, 643 F.3d at 1310 (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)).

Although Dr. Garber contends that the particular circumstances of his arrest are sufficient to show a custom or practice, the law of this Circuit provides otherwise. The single incident at issue here is insufficient to demonstrate a persistent and widespread pattern of deliberate indifference reaching the level of a settled custom or practice. *See, e.g.*, *id.*; *McDowell*, 392 F.3d at 1290; *Sewell*, 117 F.3d at 489.

Dr. Garber relies on *Grandstaff*, a case in which the Fifth Circuit concluded that a preexisting policy of disregard of human life and safety could be inferred from a single incident where multiple officers opened fire on a person suspected of a traffic violation and then opened fire on and killed an innocent victim whom the officers mistook for the suspect, and where there subsequently were no reprimands, discharges, admissions of error, or policy changes. *See Grandstaff*, 767 F.2d at 165, 171. The Fifth Circuit has stated, however, that *Grandstaff*'s holding is not widely applicable and is largely limited to the particular facts of that case. *See, e.g.*, *Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998) ("*Grandstaff* has not enjoyed wide application in this Circuit."); *Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986) (stating that "*Grandstaff* affirmed a judgment against a Texas city on a highly peculiar set of facts" and that the "*Grandstaff* panel emphasized the extraordinary facts of the case, and its analysis can be applied only to equally extreme factual situations").

*Grandstaff* is not binding precedent in this Circuit. Courts within this Circuit have rejected arguments based on *Grandstaff*, distinguishing the facts in that case and declining to infer policies

or customs from single incidents.  *See, e.g.*, *MacMillan v. Roddenberry*, No. 5:08-cv-351, 2010 WL 668281, at *1, 4 (M.D. Fla. Feb. 19, 2010) (distinguishing *Grandstaff*—which "involved the use or excessive *deadly* force, [an] incompetent and catastrophic performance by the police officers, and the complete lack of any disciplinary action or change in police policies following the event"—from a single incident where officers tased a suspect several times and struggled with him before arresting him (quotation marks omitted)), *aff'd per curiam*, 432 F. App'x 890 (11th Cir. 2011); *Rodriguez v. City of Fort Lauderdale*, No. 07-61918-CIV, 2009 WL 10666890, at *1, 4 (S.D. Fla. Apr. 15, 2009) (distinguishing *Grandstaff* and concluding that evidence of a single incident where officers pushed, kicked, and assaulted a suspect before handcuffing him was insufficient to show a policy or custom); *Daniel v. City of Tampa*, No. 93-CIV-T-17C, 1995 WL 17064337, at *10 (M.D. Fla. Feb. 24, 1995) (questioning whether *Grandstaff* was "good law" in light of more recent *Monell* liability caselaw, "even assuming it was correctly decided at the time," and distinguishing *Grandstaff*, where the entire city police force "participated in what the court called a wild barrage of activity in attempting to apprehend a suspect," from a situation where several officers in a large police force engaged in allegedly unconstitutional activity (quotation marks omitted)); *see also Sosa v. Hames*, 581 F. Supp. 2d 1254, 1279 (S.D. Fla. 2008) ("Courts that have subsequently evaluated *Grandstaff* have been reluctant to extend that court's application of *Monell* liability in the absence of extraordinary and egregious circumstances.").

The facts of this case, where four officers used physical but non-deadly force during an arrest, are likewise readily distinguishable from the facts of *Grandstaff*, where an entire shift of officers opened fire on and killed an innocent victim while pursuing a suspect for a traffic violation. *See Grandstaff*, 767 F.2d at 165, 171.  This case does not present the extraordinary and egregious

circumstances to which the Fifth Circuit itself has limited its holding. Consistent with the conclusions of other courts in this Circuit, this Court cannot conclude that a custom or practice of deliberate indifference to the use of excessive force can be inferred from the circumstances of the single incident involving Dr. Garber

The use-of-force incidents that Dr. Garber points to between the years 2013 and 2017 are likewise insufficient to establish a custom or practice. First, the statistical data in Dr. Peters's report reflects an infrequent use of force during arrests. The City had 456 use-of-force reports stemming from 291,547 arrests between 2014 and 2017, meaning that use of force was reported in approximately 0.0016 percent of arrests during that period. DE 79-5 at 12. In addition, the number of use-of-force reports alone does not demonstrate any use of *excessive* force. *Cf. Brooks v. Scheib*, 813 F.3d 1191, 1193-95 (11th Cir. 1987) (stating that the number of police complaints bears no relation to their validity and reversing a jury verdict for a plaintiff on a *Monell* claim when the plaintiff produced no evidence that past complaints of police misconduct had merit); *Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1373-74 (S.D. Fla. 2013) (stating that a list of complaints against police officers, without more, is insufficient to create an issue of fact regarding a municipality's policy of inadequately investigating or disciplining police officers and that a plaintiff must present some evidence from which to infer that complaints were meritorious).

Second, even if the five incidents that Dr. Garber identified in the Amended Complaint, *see* DE 34 at 10-11, are presumed to have involved City police officers using excessive force, those five isolated incidents over a five-year period do not show a persistent and widespread practice of deliberate indifference to unlawful uses of force. *See Denno*, 218 F.3d at 1277 (stating that random acts and isolated incidents normally are insufficient to establish a custom).

Consequently, there is no genuine issue for trial as to whether the City had a custom or practice of deliberate indifference to unlawful uses of force. The City is entitled to judgment as a matter of law on Dr. Garber's *Monell* claims. The City's Motion for Summary Judgment [DE 78] is granted.

### B. The Officers' Motion for Summary Judgment

Dr. Garber brings a claim against the Defendant officers under 42 U.S.C. § 1983, alleging that the officers used unprovoked, excessive, and unreasonable force against him, in violation of his Fourth Amendment right to be secure from an unreasonable seizure. DE 34 at 6-8. The officers seek summary judgment on this claim based on qualified immunity. DE 80. The officers contend that Dr. Garber's arrest was lawful and that the force used against him during the arrest was *de minimis* and, thus, cannot rise to the level of a constitutional violation. Alternatively, the officers maintain that the force used against Dr. Garber was reasonable under the circumstances given his resistance to the officers and his aggressive and hostile behavior. The officers assert that Dr. Garber has not identified clearly established law showing that they acted unconstitutionally.

Dr. Garber responds that the officers brutally assaulted him when he posed no threat, had not disobeyed or resisted them, was simply "rude" and "impolite," and was distraught over his daughter's death. DE 86. He contends that the assault involved more than *de minimis* force and was excessive and unreasonable under the circumstances. He compares this case to caselaw holding that unprovoked force against a non-hostile and non-violent suspect violates the Fourth Amendment, specifically citing to *Fils v. City of Aventura*, 647 F.3d 1272 (11th Cir. 2011).

"Qualified immunity shields government officials from individual-capacity suits for actions taken while performing a discretionary function so long as their conduct does not violate a

'clearly established' constitutional right." *Montanez v. Carvajal*, 889 F.3d 1202, 1207 (11th Cir. 2018).  This shield allows officials to carry out their discretionary duties without the fear of personal liability or harassing litigation.  *Manners v. Cannella*, 891 F.3d 959, 967 (11th Cir. 2018). Qualified immunity protects from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks omitted).  The applicability of qualified immunity presents a question of law for a court to decide. *Sims v. Metro. Dade Cty.*, 972 F.2d 1230, 1234 (11th Cir. 1992).

To be entitled to qualified immunity, an officer must establish that he was acting within his discretionary authority during the incident.  *Manners*, 891 F.3d at 967.  The officer proves that he acted within his discretionary authority "by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."  *Roberts v. Spielman*, 643 F.3d 899, 903 (11th Cir. 2011) (quotation marks omitted).  Here, Dr. Garber does not dispute that officers were acting within their discretionary authority during the investigation of his daughter's death and his arrest.  *See* DE 86 at 2; *see also Grider v. City of Auburn*, 618 F.3d 1240, 1268 (11th Cir. 2010) (stating that police investigations and arrests are discretionary functions).

If an officer establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the officer violated a constitutional right that was clearly established at the time of the incident.  *Montanez*, 889 F.3d at 1207.  These two components may be analyzed in any order.  *Manners*, 891 F.3d at 968.  Both components must be shown for an officer to lose qualified immunity.  *Fils*, 647 F.3d at 1287.

This Circuit uses two methods to determine whether a reasonable officer would know that his conduct is unconstitutional. *Id.* at 1291. As to the first method, a right is clearly established if, under the relevant caselaw at the time of the violation, "a concrete factual context exists so as to make it obvious to a reasonable government actor that his actions violate federal law." *Id.* (quotation marks omitted). The relevant caselaw is that of the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court of the state under which the claim arose. *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).

The second method looks at the officer's conduct and asks "whether that conduct lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law." *Fils*, 647 F.3d at 1291 (quotation marks omitted). This second method, known as obvious clarity, is a narrow exception to the general rule that only caselaw and specific factual scenarios can clearly establish a constitutional violation. *Id.*; *see also Coffin*, 642 F.3d at 1015 (stating that obvious clarity cases are rare).

Clearly established law "should not be defined at a high level of generality" and "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quotation marks omitted). Although there need not be a case directly on point for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551 (quotation marks omitted). While "general statements of the law are not inherently incapable of giving fair and clear warning to officers," the unlawfulness must be apparent in the light of pre-existing law. *Id.* at 552 (quotation marks omitted); *see also Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003) (stating that the "salient question . . . is whether the

state of the law gave the defendants fair warning that their alleged conduct was unconstitutional"

(quotation marks omitted)).   "[I]f case law, in factual terms, has not staked out a bright line,

qualified immunity almost always protects the defendant."   *Oliver v. Fiorino*, 586 F.3d 898, 907

(11th Cir. 2009).

The freedom from unreasonable searches and seizures under the Fourth Amendment

encompasses a right to be free from the use of excessive force during an arrest.   *Durruthy v. Pastor*,

351 F.3d 1080, 1093 (11th Cir. 2003).   The right to make an arrest "necessarily carries with it the

right to use some degree of physical coercion or threat thereof to effect it."   *Manners*, 891 F.3d at

973 (quotation marks omitted).   An application of *de minimis* force without more will not support

an excessive-force claim.   *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000).   Use of

*de minimis* force, even if unnecessarily, is not unlawful.   *Durruthy*, 351 F.3d at 1094; *see also*

*Graham v. Connor*, 490 U.S. 386, 396 (1989) (stating that "[n]ot every push or shove, even if it

may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment"

(citation and quotation marks omitted)).

The constitutionality of a use of force during an arrest is analyzed under an objective

reasonableness standard and is not capable of precise definition or mechanical application.

*Graham*, 490 U.S. at 396-97.   To determine whether the force used was proper, a court must ask

whether a reasonable officer would believe that the force was necessary in the situation at hand.

*Lee*, 284 F.3d at 1197.   Reasonableness is dependent on "the facts and circumstances of each

particular case, including the severity of the crime at issue, whether the suspect poses an immediate

threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting

to evade arrest by flight."   *Graham*, 490 U.S. at 396; *see also Vinyard v. Wilson*, 311 F.3d 1340,

1347 (11th Cir. 2002) (stating that factors to consider include the need for an application of force, the relationship between that need and the amount of force used, and the extent of the injury inflicted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *see also Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010) (stating that courts must account for the fact that police officers are often forced to make split-second judgments under tense, uncertain, and rapidly evolving circumstances). On summary judgment, a court "cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." *Fils*, 647 F.3d at 1288.

Viewing the evidence in the light most favorable to Dr. Garber, the force used against him was not *de minimis*. A review of the caselaw indicates that the pushing and shoving that occurred as Dr. Garber was moved down the hallway, and even the leg sweep technique that Officer Esteves conducted to take Dr. Garber to the floor, are considered *de minimis* force attendant to an arrest. *See, e.g.*, *Croom v. Balkwill*, 645 F.3d 1240, 1252-53 (11th Cir. 2011) (concluding that forcing a woman to the ground and holding her there with a foot or knee for up to ten minutes was a *de minimis* use of force); *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) (concluding that a minimal amount of force was used when officers "slammed" a suspect against a wall, kicked his legs apart, required him to raise his arms above his head, and pulled his wallet from his pants); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (111th Cir. 1993) ("But, even though pushing [the suspect] against the wall might have been unnecessary, this pushing was not plainly unlawful.").

18

However, there is also testimonial evidence from Dr. Garber and two eyewitnesses that multiple officers kicked Dr. Garber even after he was made to lie on his stomach on the floor. This use of force is distinguishable from the use of force attendant to maneuvering a suspect into a position by which to secure an arrest. *See Lee*, 284 F.3d at 1200 (stating that a minimal use of force "is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes"). Kicking a suspect lying face-down on the floor is not *de minimis* force attendant to an arrest. *Cf. id.* at 1199-1200 (concluding that slamming a suspect's head onto a car trunk after she had been secured was more than *de minimis* force); *Slicker*, 215 F.3d at 233 (concluding that kicking a suspect and hitting his head on the pavement after he had been subdued was not *de minimis* force).

The officers do not contend that any kicking that occurred was *de minimis* force. *See generally* DE 80, 96. The officers instead contend that the body camera videos "definitively refute[] any contention by [Dr. Garber] or the residents of the home that the officers repeatedly kicked plaintiff once he was on the ground." DE 96 at 4, 7. The Court has reviewed the body camera videos. Based on the angles of the videos and the fact that view is obstructed at several points, the Court cannot "definitively" conclude that officers did not kick Dr. Garber while he was on the floor. *See Shaw*, 884 F.3d at 1097 n.1 (stating that a court on summary judgment must accept the non-moving party's version of what occurred "where the recording does not clearly depict an event or action, and there is evidence going both ways on it").

The officers also contend that the residents "are not disinterested witnesses" because Dr. Garber had a good relationship with them and paid them for his daughter's share of the rent. DE 96 at 4. Although this may be true, the Court cannot at this stage weigh witness credibility.

*See Furcron*, 843 F.3d at 1304 (explaining that a court may not weigh conflicting evidence or make credibility determinations on summary judgment).  Whether officers kicked Dr. Garber while he lie on the floor on his stomach is a question of fact.  At this stage, the assertions that the kicking occurred are accepted as true.

Because the force used against Dr. Garber was not *de minimis*, the analysis turns to whether the force was objectively reasonable and to the factors relevant to such an inquiry.  Dr. Garber was cited for resisting an officer without violence.  Resisting an officer without violence is "akin to resisting arrest, an offense of sufficient severity that . . . it weighs in favor of finding some use of force to be reasonable."  *Montanez v. City of Orlando*, 678 F. App'x 905, 910 (11th Cir. 2017) (citing *Graham*, 490 U.S. at 396).  Dr. Garber's citation was for a misdemeanor.  *See* Fla. Stat. § 843.02.  Generally, "more force is appropriate for a more serious offense and less force is appropriate for a less serous one."  *Lee*, 284 F.3d at 1198; *see also Fils*, 647 F.3d at 1288 (stating that "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force").

As to the threat that Dr. Garber posed to the officers' safety and the proportionality of the force used, the evidence taken in the light most favorable to Dr. Garber shows that he began to move down the hallway when directed to do so, but stated "don't push me" when Officer Jumelles touched his back and stated "shut up" when Officer Zampini directed him to "go."  He did not resist as officers then pushed him down the hallway, but cried "you assaulted me" and "I'll be pressing charges against you."  He became seated and was then made to lie on the floor on his stomach after Officer Esteves completed a leg sweep and multiple officers landed on top of him, crying "get off me," "he assaulted me," and "you broke my . . . glasses" and grabbing onto a

bedframe at one point.  Multiple officers were kicking him, both while he was standing and while he was lying on his stomach.  He did not resist being handcuffed, although officers had difficulty placing him into handcuffs, possibly because of a rotator cuff injury.

The parties characterize Dr. Garber's responses of  "don't push me" when Officer Jumelles touched his back and "shut up" when Officer Zampini directed him to "go" vastly differently, with the officers contending that Dr. Garber was behaving in an aggressive, hostile, and threatening manner and Dr. Garber contending that he was simply rude and impolite.  Having viewed the body camera videos, the Court concludes that a reasonable officer would have felt threatened and would have believed that some force was necessary after Dr. Garber stated "shut up" directly into Officer Zampini's face after being told to move down the hallway.

Even if it was reasonable to push Dr. Garber away from the active crime scene and to take him to the floor, a reasonable officer would not have felt threatened after Dr. Garber had been taken to the floor and made to lie on his stomach.  Although not yet handcuffed, he was surrounded by multiple police officers.  Kicking Dr. Garber while he was on the floor was unnecessary to neutralize any threat that he posed.  *Cf. Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (concluding that an officer's single punch to a suspect's stomach constituted excessive force when the suspect was not struggling or resisting and posed no danger).

As to whether Dr. Garber offered resistance, there is testimonial evidence to indicate that he did not physically resist while officers moved him down the hallway.  The body camera videos, while showing that Dr. Garber was crying out while being moved down the hallway, are not determinative on the issue of whether he offered physical resistance.  Although he did not sit down when Officer Jumelles instructed him to do so, it is disputed whether he had the ability to sit, given

that other officers were holding onto him.  Dr. Garber acknowledges that, while being forced onto the floor, he offered some resistance in the form of grabbing onto the bedframe.  DE 86 at 7-8; DE 87 at 7.  The body camera video shows that his hold on the bedframe was brief before officers forced him to let go of it.

Evidence reflects that Dr. Garber's physical injuries resulting from this incident include a fractured left knee, back and spine injuries including disc herniations, hand and wrist injuries including nerve damage, reinjury of his right rotator cuff, and bruising.  He also experiences accelerated hypertension, depression, anxiety, insomnia, nightmares, and post-traumatic stress disorder.

In evaluating all of the facts and circumstances to assess the reasonableness of the officers' actions, the Court is also mindful of the events that preceded Dr. Garber's altercation with the officers.  Dr. Garber had just learned that his daughter had died.  He had viewed her body in the bathroom with drug paraphernalia nearby.  The body camera videos show that he obviously was distraught over his daughter's death.

Considering all of these factors together, the force used against Dr. Garber was objectively unreasonable and excessive.  His crime was not serious, and the evidence viewed in his favor reflects that he offered only minimal resistance to the officers forcing him away from the crime scene and onto the floor.  While he was verbally confrontational during an emotional situation, he was not physically violent.  A reasonable officer would not believe that kicking him while he lie on his stomach on the floor was necessary in that situation.

Having determined that the force used against Dr. Garber was objectively unreasonable, the analysis next tuns to whether the force violated clearly established law.  Caselaw has clearly

established that gratuitous force may not be used against a suspect who has been subdued and is not resisting. *Hadley*, 526 F.3d at 1330, 1333-34. Qualified immunity does not "immunize officers who use excessive and gratuitous force after a suspect has been subdued, is not resisting, and poses no threat." *Saunders v. Duke*, 766 F.3d 1262, 1269-70 (11th Cir. 2014).

Dr. Garber compares this case to the circumstances in *Fils v. City of Avenura*. In *Fils*, there was evidence that an officer fired his taser on a partygoer who had his hands raised and, when the partygoer fell to the ground, put his knees on the partygoer's back and "applied a contact tase" before handcuffing him. 647 F.3d at 1277, 1288. The Eleventh Circuit determined that this use of force was excessive and that qualified immunity did not protect the officer. *Id.* at 1288-92. The Eleventh Circuit noted that the partygoer had committed the minor offense of disorderly conduct, was not violent or resisting, did not pose a threat, and did not disobey instructions. *Id.* at 1292. Similarly, the Eleventh Circuit held in *Priester v. City of Riviera Beach* that an officer was not entitled to qualified immunity when he permitted his dog to attack a suspect who was on the ground and did not pose a threat. 208 F.3d 919, 927 (11th Cir. 2000). And in *Hadley v. Gutierrez*, the Eleventh Circuit determined that an officer was not entitled to qualified immunity when he punched in the stomach a suspect who was not resisting and posed no danger to the officer. 526 F.3d at 1330, 1333-34.

While these cases are not factually identical to the circumstances of this case, they give officers fair warning that gratuitous force may not be used against a suspect who has been subdued and is not resisting. *See Fils*, 647 F.3d at 1292 ("While these cases are not identical to [this] case, they need not be materially similar; the precedent need only provide the Defendants with fair warning." (quotation marks omitted)). Here, there is evidence indicating that multiple officers

repeatedly kicked Dr. Garber while he was lying face-down on the floor.  If this occurred, the caselaw is clearly established that such conduct violated Dr. Garber's Fourth Amendment right to be free from excessive force during arrest.

Based on this record and the disputed issues of fact, the Court cannot conclude that any of the officers are entitled to qualified immunity.  The officers' Motion for Summary Judgment [DE 80] is denied.

## V.    CONCLUSION

For the foregoing reasons, Defendant City's Motion for Summary Judgment [DE 78] is **GRANTED**.  The Motion for Summary Judgment of Defendant Officers Jumelles, Dunlop, Esteves, and Zampini [DE 80] is **DENIED**.

The Court will set a **Status Conference** in this matter by separate Order.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 29th day of July, 2019.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: Counsel of Record